**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| Nathan Christopher Braun, | Case No. 20-cv-331 (NEB/DTS) |
| Plaintiff, | |
| v. | **ORDER &**<br>**REPORT AND RECOMMENDATION** |
| Tim Walz, et al., | |
| Defendant. | |

---

Plaintiff Nathan Christopher Braun sued Minnesota Governor Tim Walz, the Minnesota Commissioner of Corrections, and various other officials at Minnesota Correctional Facility Rush City (MCF-RC). *See* Am. Compl., Dkt. No. 4. He alleges they violated several of his constitutional rights and seeks both damages and equitable relief. Am. Compl. 1, 8–9. Defendants moved to dismiss because the Eleventh Amendment and qualified immunity doctrines bar some of Braun's claims, and his remaining allegations fail to state a claim. This Court agrees, and thus recommends that Defendants' motion to dismiss be granted.

## FINDINGS OF FACT

### I.  Braun's Conviction and Incarceration

Braun is an inmate in the custody of the Minnesota Department of Corrections (DOC), serving a 91-month sentence for third-degree criminal sexual conduct. *State v. Braun*, A17-1889, 2018 WL 4201208, at *2 (Minn. Ct. App. Sept. 4, 2018). Braun filed this suit in January 2020 while incarcerated at MCF-RC. Several defendants are supervisors of or employees at that facility. Compl., Dkt. No. 1; Defs.' Mem. 3, Dkt. No. 45. DOC has

since transferred Braun, however, and he is now incarcerated at MCF-Oak Park Heights. Defs.' Mem. 3.

## II. Braun's Allegations

Braun alleges that MCF-RC officers violated his constitutional rights, harassed him, and retaliated against him for submitting complaints. Am. Compl. 5. Much of the retaliation for which he seeks relief is the confiscation of his property by MCF-RC officers.

### A. The Kites

In January 2020 Braun sent a kite[1] to the MCF-RC Unit 2-W sergeant. Am. Compl. 2. DOC's kite policy proscribes:

> Offenders must follow the chain of command and contact only one staff member at a time. Offenders should allow five working days, not including weekends or holidays, prior to writing the next staff in the chain of command.

Wright-MacLeod Decl. Ex. 1 (DOC Policy 303.101, Kites/Communications) at 1, Dkt. No. 46-1. After not receiving a response within five business days, Braun sent another kite "up the chain of command" to Lieutenant Gene Olson.[2] Am. Compl. 2. In that second kite Braun asked Olson "in which policy does it dictate that if Gym or Yard is cancelled due to weather that SHU in 2-W get a make-up flag?". *Id.* He also cited DOC Policy 103.220(N), *Personal Code of Conduct of Employees*, pointing out that employees "must comply with all laws of the United States and of any state and local jurisdiction." Am. Compl. 2; Wright-MacLeod Decl. Ex. 2 at 4.

---

[1] A "kite" is a DOC form that offenders use to communicate with staff. Wright-MacLeod Decl. Ex. 1 at 1, Dkt. No. 46-1. DOC Policy 303.101 governs kite procedures. *Id.*

[2] Braun's names as a defendant "Lt. Olsen," Am. Compl. 1, who DOC has identified as Gene Olson, Mem. 1 n.1, Dkt. No. 45. The Court uses the proper spelling of Lt. Olson's surname in this Report and Recommendation.

**B.  Cell Search and Property Removal**

Braun alleges that the day after sending the kite to Olson, Officer Robert Garner searched his cell and removed thirty butter packets, a fan (which Braun did not own), and a loofah. Am. Compl. 3. Braun claims Garner's search was unusual because it happened on a Friday and MCF-RC officers regularly search inmates' cells every Thursday. *See* Am. Compl. 1. Braun alleges that later that evening Garner opened his cell door, "leared [sic] menacingly" at him, and told him that he "might receive discipline." Am. Compl. 3.

Three days later, now four days after sending the kite to Olson, Braun alleges that Officer LaRoche delivered Olson's response to Braun's kite. *Id.* But while at dinner, Braun claims Officer Sarah Beckman entered his cell and removed "two original works of art that are protected under Federal copyright law as well as the First Amendment." Am. Compl. 3, 6. The artwork Braun refers to were two sketches of a medical marijuana plant leaf, which hung on his cell wall. Compl. 1; *see* Am. Compl. 2. Under those botanical illustrations was a Japanese Kanji inscription that, when translated, means "The God of Weed." Am. Compl. 7. Braun claims his "original artwork" (the image and phrase together) were "religious in nature" and represented his "personal spiritual beliefs . . . in the healing property of medical marijuana." Am. Compl. 2, 7.

Braun asked LaRoche and Beckman why they removed his artwork, but claims they would not give him a direct answer. Am. Compl. 3. He speculates, however, that Beckman confiscated his artwork as contraband, though Braun notes Beckman's conclusion was unique because no other officer confiscated the artwork, which he says hung on his wall for "well over a year" despite the weekly cell searches. Am. Compl. 6.

DOC Policy 301.030 defines contraband as:

> objects that by either statute or this policy are not allowed in a Minnesota correctional facility or on its grounds unless they have been specifically authorized by the facility warden (or a designee who is a captain or higher authority)

Wright-MacLeod Decl. Ex. 4 at 1. The policy provides examples of contraband, which includes intoxicants and controlled substances but not depictions of them. *Id.*

### C. Disciplinary Segregation

Braun alleges that instead of LaRoche and Beckman giving Braun an explanation for his cell search and artwork confiscation, they placed him on "'IR' status[3] pending a decision from the watch commander." Am. Compl. 3. Braun claims that "after review,"[4] the watch commander placed him in disciplinary segregation. *Id.* A day later, Sergeant Michael Kunze, the due process sergeant, presided over Braun's disciplinary hearing. *See* Am. Compl. 4. Braun portrays the hearing process as deficient—he received no written notice of his alleged violation; was given no chance to present documents, evidence, or call witnesses; and was ultimately "coerced into agreement of seven days of segregation." *Id.* Braun also alleges that Kunze produced no evidence of the alleged violations. *Id.*

### D. Post-Segregation Missing Property

When an inmate transfers to another unit or moves to restrictive housing, MCF staff inventory and pack-up that inmate's property. Wright-MacLeod Decl. Ex. 3. DOC Policy 302.250 regulates inmate property and requires staff to inventory each item and

---

[3] The Court does not know, and Braun does not explain, what "IR status" is.

[4] The Court presumes that Braun is implying that the Watch Commander reviewed either the artwork Beckman confiscated from Braun's cell or some related report from MCF-RC officers, though Braun provides no details.

confiscate any unauthorized or excess item. *See id.* at 5–7 (describing general process for property pack-up and inventory and additional requirements for restrictive housing unit pack-up and inventory).

After serving seven days in in-house segregation, Braun collected his property that MCF-RC staff inventoried and packed up per DOC policy. Am. Compl. 4. Braun claims he immediately noticed that multiple items were missing. *Id.* He lists several missing items (*e.g.*, cups, bowls, conditioner) totaling $38.75, but also notes that a magazine photo depicting a woman, which he had affixed to his wall, was absent. Am. Compl. 2, 4. So too was "a copywritten piece of literary work that [Braun] had affixed to a tangible medium"— a book. Am. Compl. 4. That book, entitled Stonerism: A Path to Peace, was one that Braun authored and planned to mass-market and sell in dispensaries worldwide. Am. Compl. 8.

### III. Braun's Legal Claims

Braun alleges violations of his First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights. His First Amendment claim arises under both the Petition Clause and the Free Exercise clause. First, Braun claims that MCF-RC officers retaliated against him for submitting his kite to Olson, and that retaliation "violate[d his] Firt [sic] Amendment right to petition the government for redress of grievances." Am. Compl. 5. Second, because Braun portrays his "original works of art" as religious and representative of personal spiritual beliefs, he argues MCF-RC officers' confiscation of those items "violat[ed] his First Amendment Right to practice his religion." Am. Compl. 7. His Fifth and Fourteenth Amendment due process claim stems from his belief that "the discipline process did not follow the standard established in *Wolff v. McDonnell*," 418 U.S. 539

(1974). Am. Compl. 7. Next, Braun claims that MCF-RC officers' failure to follow procedure when inventorying and packing the property in his cell violated his Fourth Amendment rights. *Id.* Finally, Braun alleges that his Eighth Amendment rights were violated, though nowhere clarifies who or what actions caused that violation.

He seeks both damages and equitable relief. As damages, Braun seeks $100,000 to compensate for lost earnings from Stonerism: A Path to Peace, and another $100,000 "for the psychological torment of inflicted fear from retaliation by the defendants, and depriving [Braun] of his Right to exercise his spiritual beliefs."[5] Am. Compl. 8–9. As equitable relief, Braun requests that the Court immediately enjoin Defendants "from any further retaliatory conduct, and that [Braun's] property be either returned to him pending discovery, or that the defendants be sanctioned to compensate for the intentional loss of his property," and an order of protection from further retaliation.[6] Am. Compl. 8–9.

Though he aligns some facts to specific constitutional claims, he brings his claims and seeks relief from all ten defendants in their official capacity and seven of those defendants in their individual capacity. Nowhere does his complaint parse out which claims align with what defendants, which relief remedies each claim, or from which defendants he seeks his requested relief.

---

[5] Braun does not request any damages for his other missing items.

[6] In a separate filing, Braun also requested $15,000 in statutory damages for MCF-RC improperly classifying him as a Tibetan Buddhist rather than a Stoner. Pl.'s Aff. 2–3, Dkt. No. 53. Because Braun neither sought leave to amend nor obtained Defendants' permission, as required by Rule 15, his First Amended Complaint (Docket No. 4) is the operative pleading.

## CONCLUSIONS OF LAW

Defendants move to dismiss Braun's complaint on multiple grounds. They assert that the Eleventh Amendment bars the official capacity claims and that qualified immunity shields the officers from individual liability. They also posit that the Prison Litigation Reform Act[7] precludes some of the relief Braun seeks and that his complaint fails to plead plausible claims for relief. For a combination of those reasons, none of Braun's claims survive and his entire suit must be dismissed.

## I.  Official Capacity Claims

### A.  Legal Standard – Eleventh Amendment

The Eleventh Amendment protects states from certain liability by withholding federal court jurisdiction. *Hans v. Louisiana*, 134 U.S. 1, 15 (1890). It provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State . . . ." U.S. Const. amend. XI. Despite the phrase "another State," it is well established that "'an unconsenting State is immune from suits brought in federal courts *by her own citizens* as well as by citizens of another state.'" *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 304 (1990) (emphasis added). The issue is jurisdictional: under the Eleventh Amendment, federal courts generally lack subject-matter jurisdiction over claims against an unconsenting state. *See Sossamon v. Texas*, 563 U.S. 277, 284 (2011); *Gardner v. Minnesota*, No. 16-cv-3999 (JNE/KMM), 2019 WL 1084714, at *3–4 (D. Minn. Jan. 15, 2019), *report and recommendation adopted*, 2019 WL 1086338 (D. Minn. Mar. 7, 2019). The Eleventh Amendment bar to state suits applies unless the state

---

[7] Pub. L. No. 104-134, 110 Stat. 1321.

consents to suit or Congress abrogates the state's sovereign immunity, *Skelton v. Henry*, 390 F.3d 614, 617 (8th Cir. 2004), and federal courts must dismiss suits barred by the Eleventh Amendment, *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 64–65, 73 (1996).

Under the Eleventh Amendment, suits against a state agency are functionally suits against the state itself. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997) (citing cases); *Hanks v. Hills*, 373 F. Supp. 3d 1230, 1232 (D. Minn. 2017) (citing *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594 (8th Cir. 2007)), *report and recommendation adopted*, 2017 WL 10243525 (D. Minn. Nov. 27, 2017). Similarly, official capacity § 1983 claims against a state employee are also functionally claims against the state itself. *Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity . . . should be treated as suits against the State."). Thus, all of Braun's official capacity § 1983 claims are functionally claims against the State of Minnesota.

**B. Claims Seeking Monetary Relief are Barred by the 11th Amendment**

Braun seeks $100,000 in damages "for the theft and destruction of [his] original works." Am. Compl. 8. Suits for money damages paid from the state treasury—even if the action names a state official and not the state—exceed Article III jurisdiction as limited by the Eleventh Amendment. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). Braun suggests several cases confirm that the State has waived its—or Congress has abrogated Minnesota's—sovereign immunity. Pl.'s Aff. 1, Dkt. No. 56. Waiver or abrogation requires express language or overwhelming implication. *DeGidio v. Perpich*, 612 F. Supp. 1383, 1389 (D. Minn. 1985).

For example, Braun cites *Nieting v. Blondell*, 235 N.W.2d 597 (Minn. 1975) to argue that Minnesota abolished its tort immunity and thus consented to suit. But "a state's

waiver of sovereign immunity in its own courts is not a waiver of the Eleventh Amendment immunity in the federal courts." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 n.9 (1984). He likewise cites many tangentially related cases such as *Federal Housing Administration v. Burr*, 309 U.S. 242 (1940) and *Erie Railroad Company v. Tompkins*, 304 U.S. 64 (1938) to advance a theory that states engaged in commercial transactions have waived their immunity and are liable for tortious injuries. Pl.'s Aff. 1, Dkt. No. 56. But these cases are inapposite and fail to meet the "express language or overwhelming implication" requirement. Courts in this District have repeatedly found that Minnesota has not waived its sovereign immunity for § 1983 claims. *E.g.*, *Tate v. Minn. Dep't of Corr.*, No. 15-cv-3115 (WMW/JJK), 2016, WL 11491376, at *5 (D. Minn. April 1, 2016); *Smith v. Fabian*, No. 10-cv-2193 (JRT/TNL), 2012 WL 1004982, at *3 (D. Minn. Mar. 26, 2012).

Minnesota's sovereign immunity thus bars Braun's official capacity claim for damages "for the theft and destruction of his original works." Am. Compl. 8. For that reason, Braun's claim for such damages against all defendants in their official capacity should be dismissed for lack of jurisdiction.

Likewise, Braun's claim for damages "for the psychological torment of inflicted fear from retaliation by defendants, and depriving [him] of his Right to exercise his spiritual beliefs," Am. Compl. 8, is barred by sovereign immunity. Moreover, this claim is barred by the Prison Litigation Reform Act (PLRA), which provides:

> No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of title 18).

42 U.S.C. § 1997e(e); *Royal v. Kautzky*, 375 F.3d 720, 722 (8th Cir. 2004). Braun has not pleaded that he sustained any physical injury or was the victim of any sexual act. Thus,

Braun's claim for emotional distress damages against Defendants—both in their official and individual capacities—is barred and must be dismissed.

### C.  Claims for Injunctive Relief

Braun similarly asserts claims for equitable relief against the defendants in their official capacities. Under *Ex parte Young*, 209 U.S. 123 (1908), sovereign immunity does not bar official capacity claims against state officials for prospective injunctive relief, though it does bar claims for retrospective injunctive relief. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (citing *Ex parte Young*); *Edelman v. Jordan*, 415 U.S. 651 (1974).

Braun seeks two forms of injunctive relief. First, he seeks an order enjoining Defendants "from any further retaliatory conduct, and that [Braun's] property be either returned to him pending discovery, or that the defendants be sanctioned to compensate for the intentional loss of his property." Am. Compl. 8–9. Second, he seeks an "order of protection" from further retaliation. *Id.*

#### 1.  Injunction from Further Retaliation

The injunction against and "order of protection" from further retaliation are precisely the type of prospective relief that Braun can seek in federal court. *Bennie v. Munn*, 822 F.3d 392, 397 (8th Cir. 2016). Since filing this suit, however, the DOC has transferred Braun to another prison. Defs.' Mem. 3. That transfer makes his request for injunctive relief moot. *Brazil v. Ark. Dep't of Hum. Servs.*, 892 F.3d 957, 960 (8th Cir. 2018) (holding as nonjusticiable a request for injunctive relief after harmful conduct ceased). Braun has failed to plead any facts suggesting that any of the alleged retaliatory conduct is ongoing at MCF-OPH. For the Court to enjoin state officials there must be a connection between

those officials' conduct and an ongoing violation of federal law. *Green v. Mansour*, 474 U.S. 64, 68 (1985) ("Remedies designed to end a *continuing violation* of federal law are necessary to vindicate the federal interest in assuring supremacy of that law." (emphasis added)).

### 2. Return of Property

Braun also requests DOC be ordered to return his property, property which MCF-RC officers designated as contraband. Am. Compl. 6, 8. DOC's contraband policy requires staff to confiscate contraband and process the items as evidence. Wright-MacLeod Decl. Ex. 4 (DOC Policy 301.030(C)(5), Contraband) at 4, Dkt. No. 46-1. DOC only retains that evidence for sixty days after adjudicating prisoner discipline. DOC Policy 301.053(E)(1), Evidence Management, available at https://perma.cc/TX84-J4TH. It has been more than double that time, so if Braun's property was not released to him, that means MCF-RC staff likely disposed of it, making his requested relief unavailable. In fact, Braun expressly pleads that his "original book and artwork has either been lost by facility staff or confiscated and destroyed by discipline." Am. Compl. 8. The injunctive relief Braun seeks is thus futile.

What remains is Braun's alternative request for sanctions "to compensate" for the loss of his property. If the Court construes Braun's request for sanctions as one for compensatory damages, it is precluded by the Eleventh Amendment. Even assuming sanctions were deemed an appropriate injunctive remedy, they would be ordered to correct a past harm and therefore would be in the nature of retrospective relief, which is barred by the Eleventh Amendment. *See also Green*, 474 U.S. at 64; *Chaney v. Louisiana State*, No. 19-cv-346, 2019 WL 5696149, at *3 (E.D. La. Mar. 25, 2019).

For these reasons, all of Braun's official capacity claims must be dismissed.

## II. Individual Capacity Claims

### A. Pleading Deficiencies

Braun also brings individual capacity claims against seven MCF-RC employees. Under Rule 8(a)(2), a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Rule 8 was promulgated to provide defendants with fair notice of the claim and the grounds on which it rests. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).

Though Braun has identified individual conduct, he has not pleaded which defendant's conduct violated which of his constitutional rights. Rather, he asserts legal claims against and requests relief from "defendants." His complaint presents sweeping allegations accusing the defendants of violating several of his constitutional rights without connecting how each defendant relates to each alleged constitutional injury. To provide perspective, Braun names ten defendants in their official capacity, seven of them also in their individual capacity, and brings six constitutional claims against each of them. That means Braun's suit alleges six legal claims against seventeen defendants for a total of 102 potentially distinct claims.

This District has repeatedly rebuked improper "shotgun pleadings," pleadings when a plaintiff asserts every claim against every defendant. *I.E.C. ex rel. J.R. v. Minneapolis Pub. Schs., SSD No. 1*, 970 F. Supp. 2d 917, 928 (D. Minn. 2013) ("Such shotgun pleadings have been continually discouraged in this District."); *Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn. 2012) ("A complaint which lumps all defendants together and does not sufficiently allege who did what to whom, fails

to state a claim for relief because it does not provide fair notice of the grounds for the claims made against a particular defendant."); *Gurman v. Metro Hous. and Redevelopment Auth.*, 842 F. Supp. 2d 1151, 1153 (D. Minn. 2011) ("This Court has repeatedly criticized the filing of 'kitchen-sink' or 'shotgun' complaints—complaints in which a plaintiff brings every conceivable claim against every conceivable defendant. Such complaints are pernicious for many reasons." (footnote citing additional cases from 1990 to 2009 omitted)); *Tully v. Bank of America, N.A.*, No. 10-cv-4734 (DFW/JSM), 2011 WL 1882665, at *6 (D. Minn. May 17, 2011) ("Plaintiffs assert each of the causes of action against the Defendants generally, but do not otherwise specify which claims are asserted against any particular defendant, or which specific claims each Plaintiff is asserting. Thus, the Bank Defendants, and the Court, are left to guess which Plaintiffs are asserting which claims against which Defendants.").

The federal pleading requirements are not unwieldly or unnecessarily complex; they require only a "short and plain" statement of facts organized to identify who the claim is against—a rule which itself is short and plain. *Gurman*, 842 F. Supp. 2d at 1152. For Braun to state an actionable constitutional claim, he must only "set forth specific factual allegations showing what each named defendant allegedly did, or failed to do, that purportedly violated [his] federal constitutional rights." *Johnson v. Minn. Dep't of Corrs.*, No. 12-cv-784 (PAM/JSM), 2012 WL 2050246, at *3 (D. Minn. May 15, 2012). Though Braun has set forth specific factual allegations, he provides no coherent correlation between the facts he pleads and the claims he pursues. This method of pleading does not provide Defendants with any fair notice of the nature of the claims against them. *See*

*Richards v. Dayton*, No. 13-cv-3029 (JRT/JSM), 2015 WL 1522199, at *12 (D. Minn. Jan 30, 2015).

The Court recognizes that Braun is not represented by counsel, but *pro se* parties are not excused from complying with the Federal Rules of Civil Procedure. *Am. Inmate Paralegal Ass'n v. Cline*, 859 F.2d 59, 61 (8th Cir. 1988) ("Pro se litigants are not excused from complying with court orders or substantive and procedural law."); *United States ex rel. Ellis v. City of Minneapolis*, No. 11-cv-416 (PJS/TNL), 2012 WL 6652885, at *2 (D. Minn. Dec. 21, 2012) ("The Federal Rules of Civil Procedure apply to pro se litigants."). Braun should recognize this given his prolific recent filing history; he has filed four § 1983 actions in this District in the past two years. *See Evenstad v. Schnell*, No. 20-cv-885 (JRT/KMM) (D. Minn. filed Apr. 6, 2020); *Braun v. Walz*, No. 20-cv-333 (D. Minn. filed Jan. 24, 2020); *Braun v. Walz*, No. 20-cv-331 (NEB/DTS) (D. Minn. filed Jan. 24, 2020); *Braun v. D.O.C.*, 18-cv-3355 (JNE/ECW) (D. Minn. filed Dec. 10, 2018).

Because Braun's complaint runs afoul of Rule 8, it is subject to dismissal. *Gurman*, 842 F. Supp. 2d at 1154. However, as described below, even construing Braun's complaint to plead each legal claim against each defendant named in his or her individual capacity based on their alleged individual conduct, Braun's complaint must be dismissed.

### B.  Eighth Amendment

The Eighth Amendment protects against excessive bail, excessive fines, and cruel and unusual punishment. U.S. Const. amend. VIII. It is unclear from Braun's complaint what Eighth Amendment claim he is asserting. Given that Braun has not incurred fines and is not eligible for bail, the Court presumes that Braun is alleging that MCF-RC officers violated his right to be free from cruel and unusual punishment. But even then it is unclear

whether Braun's claim rests on his disciplinary segregation, the seizure of his property, or something else.

A cognizable Eighth Amendment claim requires Braun to show "'unnecessary and wanton infliction of pain,' as well as a deprivation 'denying the minimally civilized measure of life's necessities.'" *Phillips v. Norris*, 320 F.3d 844, 848 (8th Cir. 2003) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). He must also show that the defendants acted with some deliberate indifference to his health or safety, or acted maliciously to cause him harm. *Id.*

Braun has not pleaded any of the requisite elements of an Eighth Amendment claim and none of the alleged conduct can support one. Segregation, even without cause, does not violate the Eighth Amendment, *Kennedy v. Blankenship*, 100 F.3d 640, 642 (8th Cir. 1996), and the Eighth Circuit has upheld periods of segregation far longer than Braun's as constitutionally permissible, *Phillips*, 320 F.3d at 846 (holding thirty-seven days in segregation permissible). "[P]unishing an inmate to preserve internal order and discipline and to maintain institutional security does not violate the Eighth Amendment unless the punishment or force used is repugnant to the conscience of mankind." *Jackson v. Gutzmer*, 866 F.3d 969, 978 (8th Cir. 2017) (cleaned up). If Braun believes the Eighth Amendment applies to MCF-RC officers seizing his property, he provides no support for that claim, and the Court likewise cannot find any.

### C. Fourth Amendment

The Fourth Amendment prohibits unreasonable searches and seizures. U.S. Const. amend. IV. That limit does not prohibit the government from searching an area or seizing one's property, but mandates only that the search or seizure be reasonable.

MCF-RC officers entering Braun's cell and taking his property is not a Fourth Amendment violation. The need for increased security and control in prisons requires that certain penological interests override individual interests. For this reason, the United States Supreme Court has held the Fourth Amendment "does not apply within the confines of the prison cell" because "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell." *Hudson v. Palmer*, 468 U.S. 517, 525–26 (1984).

Braun also pleads that his Fourth Amendment violation stems from "staff intentionaly [sic] fail[ing] to follow procedure" when inventorying and packing up his property. Am. Compl. 7. But there is no federal constitutional liberty interest in having state officers follow state law or prison officers follow prison policies. *Kennedy v. Blankenship*, 100 F.3d 640, 643 (8th Cir.1996). Braun has thus failed to plead a plausible Fourth Amendment claim.

### D. Fifth and Fourteenth Amendments

Braun next alleges that the discipline he incurred violated his due process rights under the Fifth and Fourteenth Amendments. Am. Compl. 7. He believes MCF-RC's discipline process contravened the standard established in *Wolff v. McDonnell*, and highlights that he had possessed the items seized as contraband in plain view for over a year before he was disciplined. *Id.* It is unclear exactly which aspects of the disciplinary process Braun believes violated his due process rights, though he suggests four deficiencies: first, he "did not receive written notice of the alleged violation prior to the hearing"; second, he "was not offered opportunity to present documentary evidence or call witnesses"; third, MCF-RC officers produced no "evidence involved in the alleged

violations" at his disciplinary hearing; and fourth, he possessed the alleged contraband in plain view for a year without discipline. Am. Compl. 4, 6–7.

Both the Fifth and Fourteenth Amendments have a due process clause, which provide that neither the United States nor state governments shall deprive any person "of life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV. The Due Process Clauses also embody two separate protections: procedural due process and substantive due process. Procedural due process, as the name implies, ensures that the state follows the proper procedure before depriving an individual of life, liberty, or property, while substantive due process assesses whether the state had sufficient justification for that deprivation.

Because Braun challenges the conduct of state actors, his claim is proper under only the Fourteenth Amendment's due process clause. Nowhere does Braun distinguish whether he raises a procedural or substantive due process claim. The procedural deficiencies he notes, however, and his allegation that MCF-RC's disciplinary procedure did not conform to *Wolff v. McDonnell*—a case about procedural due process—imply that his claim raises issues of procedural due process only.

"To set forth a procedural due process violation, a plaintiff, first, must establish that his protected liberty or property interest is at stake." *Schmidt v. Des Moines Pub. Schs.*, 655 F.3d 811, 817–18 (8th Cir. 2011). Thus, courts assess the adequacy of a prison's disciplinary procedure only after the inmate first establishes deprivation of a constitutionally protected liberty interest. *See Bealieu v. Ludeman*, 690 F.3d 1017, 1047 (8th Cir. 2012). In the prison context, changes in an inmate's conditions of confinement implicate a liberty interest only when that change creates "deprivations which work such

major disruptions in a prisoner's environment and life that they present dramatic departures from the basic conditions and ordinary incidents of prison sentences." *Moorman v. Thalacker*, 83 F.3d 970, 972 (8th Cir. 1996). The Eighth Circuit has firmly established that placing an inmate in segregation, even without cause, is not the atypical hardship or dramatic departure from ordinary prison conditions that implicates a protected liberty interest. *Orr v. Larkins*, 610 F.3d 1032, 1034 (8th Cir. 2010) (per curiam). While "particularly lengthy" segregation may implicate a liberty interest, the nine months of segregation in *Orr* was not too long, *id.* at 1033, so neither is Braun's seven days of segregation. *Compare Smith v. McKinney*, 954 F.3d 1075, 1083 (8th Cir. 2020) (365 days in "the hole" not an atypical and significant hardship) and *Bandy-Bey v. Crist*, 578 F.3d 763, 767 (8th Cir. 2009) (twenty-five days of segregation "did not offend a protected liberty interest") and *Portley-El v. Brill*, 288 F.3d 1063, 1065–66 (8th Cir. 2002) (same for thirty days of segregation) *with Williams v. Norris*, 277 Fed. Appx. 647 (8th Cir. 2008) (confinement in segregation for twelve years was deprivation of a protected liberty interest). Thus, Braun's amended complaint does not plead the deprivation of a constitutionally protected liberty interest.

### E.  First Amendment Retaliation

Braun asserts that MCF-RC officers retaliated against him for submitting kites to prison officials. Braun does not allege what conduct was retaliatory, but implies that it manifested as cell searches, property confiscation, and, ultimately, disciplinary action. Essentially, Braun argues that because many—from his point of view—adverse actions occurred after he submitted the kite to Olson, those incidents must have been retaliatory. Braun reaches his conclusion by relying on the idea that the correlation between the

timing of events implies a causal link. That an event or series of events occurred in succession cannot evidence that the later are a necessary consequence of the former.

A plaintiff alleging First Amendment retaliation must show that (1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the exercise of that protected activity motivated the official to take adverse action against him. *Saylor v. Nebraska*, 812 F.3d 637, 645–46 (8th Cir. 2016); *see Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (modifying third factor by requiring but-for causation between adverse action and retaliatory motivation). Put simply, "the plaintiff must show the official took the adverse action because the plaintiff engaged in the protected [activity]." *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004).

Filing a prison grievance is protected First Amendment activity. *Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007). Even "a threat of retaliation is sufficient injury if made in retaliation for an inmate's use of prison grievance procedures." *Burgess v. Moore*, 39 F.3d 216, 218 (8th Cir. 1994). That said, prison adverse action only violates the First Amendment if the prisoner's exercise of a constitutionally protected right was *the motivating factor* for that adverse action. *See Goff v. Burton*, 7 F.3d 734, 738 (8th Cir. 1993) ("Finding that an impermissible retaliatory motive was *a factor* is insufficient to establish a claim in a prisoner retaliatory transfer case."). And "if the discipline which the prisoner claims to have been retaliatory was in fact imposed for an actual violation of prisoner rules or regulations, then the prisoner's claim that the discipline was retaliatory must fail." *Id.*

An officer's observation of contraband in a prisoner's cell justifies the officer's entry into and search of that cell. *Goff*, 7 F.3d at 738. Even if officers decided—as Braun's pleading seems to imply—to enforce the contraband rule in retaliation for the kite, the adverse action Braun experienced flows directly from possession of contraband, not from submission of kites. Braun has failed to plead a plausible First Amendment retaliation claim.

### F.  First Amendment Free Exercise

#### 1.  Legal Standard

Finally, Braun alleges the seizure of his images and book violated his First Amendment right to practice his religion under the Free Exercise Clause. The Free Exercise Clause "embraces two concepts[]—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." *Cantwell v. Connecticut*, 310 U.S. 296, 303–04 (1940). Though some constitutional rights are heavily curtailed while in prison, inmates still enjoy a constitutional protection from unreasonable infringement on the freedom to freely exercise their religion. *Cruz v. Beto*, 405 U.S. 319 (1972).

Evaluating a Free Exercise claim requires the Court to examine whether (1) the challenged government action interfered with a sincerely held religious belief; and (2) the government interference was "reasonably related to legitimate penological interests." *Gladson v. Iowa Dep't of Corr.*, 551 F.3d 825, 831 (8th Cir. 2009). Courts assess that second reasonableness prong using the *Turner* factors:

> (1) whether there is a "valid rational connection" between the prison regulation and the government interest justifying it;

(2) whether there is an alternative means available to the prison inmates to exercise the right;

(3) whether an accommodation would have "a significant 'ripple effect'" on the guards, other inmates, and prison resources; and

(4) whether there is an alternative that fully accommodates the prisoner "at de minimis cost to valid penological interests."

*Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979, 982–83 (8th Cir. 2004) (quoting *Turner v. Safley*, 482 U.S. 78, 81 (1987)). And as a threshold matter, a claimant must establish that the prison policy places a "substantial burden" on exercising their religion. *Gladson*, 551 F.3d at 833.

## 2. Analysis

Defendants argue that Braun has alleged no facts to suggest his belief is sincerely held. The Court recognizes the broad spectrum of religious and spiritual beliefs, both mainstream and scarcely practiced. For that reason, the Court hesitates to question the validity of Braun's beliefs—only he can know the strength and veracity of his personal convictions. The court "should not undertake to dissect religious beliefs because . . . [one's] beliefs are not articulated with clarity and precision that a more sophisticated person might employ." *United States v. Ali*, 682 F.3d 705, 710 (8th Cir. 2012). But, at times, "an asserted belief might be so bizarre, so clearly non-religious in motivation, as not to be entitled to protection." *Frazee v. Illinois Dep't of Emp't Sec.*, 489 U.S. 829, 834 n.2 (1989).

'Stonerism' appears to be no more than a concept designed to look much like a religion. True, Braun pleads that the illustrations represented his personal spiritual and religious beliefs, Am. Compl. 2, rather than a lifestyle. His illustrations bore an inscription entitling the representation as a deity. Am. Compl. 7. He alleged that he kept the images

conspicuously displayed on the wall of his cell for over a year. Am. Compl. 6–7. He kept a book containing related writings next to the illustrations. Am. Compl. 7. And he claims he meditated in the presence of the shrine. *Id.* These details, superficially, imitate other recognized religious practices.

But courts "must ask whether the claimant holds his belief honestly and in good faith or whether he seeks to wear the mantle of religious immunity merely as a cloak" with disingenuous motive. *People v. Woody*, 394 P.2d 813, 821 (Cal. 1964). Courts confronting similar claims of religious belief have expressed significant skepticism, albeit in a different procedural context. "Adding 'ism' does not change the meaning nor magically metamorphose '[stoner]' into a religion." *Peloza v. Capistrano Unified Sch. Dist.*, 97 F.3d 517, 521 (9th Cir. 1994). 'Stoner' and 'Stonerism' define a cultural sentiment or political ideology: "the belief that the world would be a better place if everyone freely smoked weed."[8] That lifestyle "has nothing to do with *how* the universe was created; it has nothing to do with whether or not there is a divine Creator (who did or did not create the universe . . . .)." *Peloza*, 97 F.3d at 521. One cannot simply dub a lifestyle a religion to protect a way of life if based on purely secular considerations. *See Koger v. Bryan*, 523 F.3d 789, 797 (7th Cir. 2008) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972)).

Braun's essential pleading is that he has a spiritual belief in the healing powers of medical marijuana. Am. Compl. 2. While the Court does not question whether Braun believes what he says, it nonetheless concludes that he has not pleaded enough contextual facts of his beliefs to show that those beliefs form a religion and are sincerely

---

[8] *Stonerism*, UrbanDictionary.com, https://perma.cc/G56N-FPYA (last visited Jan. 27, 2021).

held. Nowhere does Braun describe others who engage in similar spiritual practice, tell of the tenets and teachings, or elaborate on the metaphysical beliefs or ultimate ideas of Stonerism. The Court's skepticism of whether Braun's drug-based ideologies are a religion is not unique; other federal courts have been similarly doubtful of marijuana-based religions. *See, e.g.*, *United States v. Quaintance*, 471 F. Supp. 2d 1153, 1170 (D.N.M. 2006) (finding "Church of Cognizance" not a religion); *United States v. Meyers*, 906 F. Supp. 1494, 1509 (D. Wyo. 1995), *aff'd*, 95 F.d 1475 (10th Cir. 1996) (finding same for "Church of Marijuana"). In short, this Court is not determining whether Braun's belief in Stonerism is or is not a sincerely held religious belief. Rather, the Court finds that Braun has failed to plead facts necessary to state a plausible claim for a Free Exercise violation.

## ORDER

For these reasons, IT IS HEREBY ORDERED that Plaintiff's Motion to compel [Docket No. 58] is **DENIED AS MOOT**.

## RECOMMENDATION

For these reasons, the Court RECOMMENDS:

1. Defendants' Motion to dismiss [Docket No. 44] be **GRANTED**; and

2. This matter be **DISMISSED WITHOUT PREJUDICE**.


Dated: January 29, 2021                     _s/ David T. Schultz_____
                                            DAVID T. SCHULTZ
                                            United States Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).